S. R. HAZELRIGG, Appellant,

v.

AMERICAN FIDELITY & CASUALTY CO., a corporation, Appellee.

No. 5123.

United States Court of Appeals
Tenth Circuit.

Nov. 26, 1955.

Gus Rinehart, Oklahoma City, Okl. (Butler, Rinehart & Morrison, Oklahoma City, Okl., were with him on the brief), for appellant.

Welcome D. Pierson, Oklahoma City, Okl., for appellee.

Before PHILLIPS, Chief Judge, HUXMAN, Circuit Judge, and SAVAGE District Judge.

PHILLIPS, Chief Judge.

On September 4, 1948, a collision occurred between a 1937 Plymouth Sedan driven by Virgil Lafever and an International Truck, owned by Hazelrigg and used in his business and being driven at the time of the collision by his employee, Marvin Archie Bryant. Lafever was instantly killed as a result of the collision.

On May 20, 1949, Mrs. Opal Lafever, widow of Lafever, brought an action against Hazelrigg in the Superior Court of Seminole County, Oklahoma. The American Fidelity & Casualty Co.[1] was Hazelrigg's insurer under a public liability insurance policy. The Casualty Company, pursuant to the provisions of the policy, assumed the defense of the personal injury action. On May 10, 1950, an order was entered substituting C. S. Duvall as administrator of the estate of Lafever and as guardian of the estate of Reba Pauline Lafever, Wanda Jean Lafever and Gary Lee Lafever as party plaintiff. The state court action came on for trial on December 6, 1950. A verdict was entered in favor of the administrator and guardian for $79,375. The state court required a remittitur of $19,375. The plaintiffs filed such remittitur and judgment was entered in the amount of $60,000. The total liability under the insurance policy was $50,000. Counsel for the Casualty Company gave notice of intention to appeal to the Supreme Court of Oklahoma. Supersedeas bond was fixed at $67,000 and 30 days from March 16, 1951, was allowed in which to file such bond.

On March 17, 1951, the attorney for the administrator and guardian advised both the Casualty Company and Hazelrigg in writing that he would accept $50,000 in complete settlement of the judgment. On April 20, 1951, Gus Rinehart, attorney for Hazelrigg, wrote the following letter to Welcome D. Pierson, one of the attorneys for the Casualty Company and Hazelrigg in the state court action:

"Dear Mr. Pierson: Following our conversation concerning the supersedeas bond on the above captioned case, we have made every effort to work out some arrangement whereby Mr. Sid Hazelrigg could satisfy the plaintiff on a supersedeas bond. We have not been able to work out any arrangement short of making a valid supersedeas bond. As Mr. Hazelrigg advised you, he is unable to put up collateral sufficient to make this bond and therefore he will be in the position of being exposed to the levy of execution on his property and franchises.

"As you advised me, a proposition has been made for settlement of this judgment in the amount of $50,000.-00 which is within the limits of Mr. Hazelrigg's insurance contract. You state your company is unwilling to pay this sum of money in compromise, since you feel that various points should be presented to the Supreme Court. This offer, however, is within the limits of Mr. Hazelrigg's insurance policy and in order to save his business and to keep executions from being issued against his properties, we request your company do one of two things. Either execute the full supersedeas bond, in which event your company can continue its appeal and continue its control over this litigation, or to settle the case within the limits of your company's insurance policy and thereby save Mr. Hazelrigg from any further exposure."

On April 20, 1951, Welcome D. Pierson, who represented Hazelrigg and the Casualty Company as counsel in the state court action, wrote a letter to Rinehart

[1]. Hereinafter called the Casualty Company.

in which he stated that under the terms of the policy the Casualty Company was not obligated to make or furnish a supersedeas bond; that he had discussed a proposed settlement with Hazelrigg on March 30, 1951; that he told Hazelrigg the offer of settlement was unreasonable; that Hazelrigg agreed that the offer should be declined; that on April 10, 1951, Hazelrigg told him he did not blame the Casualty Company for declining to pay the $50,000 in settlement of the judgment. Pierson further stated that the judgment was excessive under the decisions of the Supreme Court of Oklahoma and the facts in the case; that there were numerous errors in the record, and that the Casualty Company would prosecute an appeal from the judgment. Such appeal was prosecuted and resulted in affirmance of the judgment in the state court action.[2]

Thereupon, the Casualty Company paid $50,000, with interest at the rate of six per cent per annum from March 16, 1951, unpaid. Thereafter, on April 29, 1954, Hazelrigg brought this action against the Casualty Company for a declaratory judgment, seeking an adjudication that the Casualty Company acted carelessly and negligently and in bad faith in not settling the state court judgment, and as a result had subjected Hazelrigg to a liability of $10,000, with interest.

From a summary judgment in favor of the Casualty Company, Hazelrigg has appealed.

Pertinent facts with respect to the state court action are set out in the dissenting opinion of the Supreme Court of Oklahoma,[3] which, in part, reads as follows:

"Virgil Lafever was killed in a collision between an automobile driven by himself and a truck belonging to the defendant. There was one witness who testified for the plaintiff who claimed he saw the accident. He was riding in the back seat of the automobile and was the father-in-law of the deceased Lafever. A man by the name of Harmon was riding in the front seat with Lafever, but he did not testify. The father-in-law testified that the collision occurred on the south side of the road, the automobile side. The driver of the truck testified the collision occurred on the north side. All physical evidence in the way of debris and the location of the truck and automobile after they came to rest indicated it was on the north side. There was testimony by substantial witnesses that the deceased Lafever was under the influence of intoxicating liquor a short time before the accident. There was also evidence to the contrary. There was sufficient evidence to necessitate the submission of the case to the jury, but I think the trial court erred in not granting a new trial for three reasons. The first reason is that it was error to permit the so-called expert, W. L. James, to testify as to how the debris got on the north side of the road. I think that the reasoning on this point in Hamre v. Conger, 357 Mo. 497, 209 S.W.2d 242, is so sound that it should be followed in this case. The crude wheel that was used by the witness and his testimony based on conjecture were bound to mislead the jury.

\* \* \* \* \*

"The second reason that this case should be reversed is that plaintiff's counsel made improper statements in closing argument which from the size of the verdict unquestionably influenced the jury. I submit that the following statements made by counsel for plaintiff constitute reversible error:

" 'You know, it is unpleasant, it's awfully hard to talk about hunger and poverty. It's a difficult thing to think about; little barefoot children

---

2. Hazelrigg Trucking Co. v. Duvall, Okl., 261 P.2d 204, 210.

3. Hazelrigg Trucking Co. v. Duvall, Okl., 261 P.2d 204, 210.

when there is frost on the ground. It's hard to think about little blue bodies caused by lack of clothing when the north wind blows. It's unpleasant to think about widows and orphans wearing cast off rags from the neighbors. It's hard to think about a fevered brow that has to be treated as a charity patient. Gentlemen, about two weeks from now in a little cross-roads country town, if Mr. Pierson and Mr. Edwards have their way, there will be a small boy pressing a little face against the showcase of a show window on the street * * *.

" 'By Mr. Seay: I would like to know if counsel is going to continue interrupting me. He has had his say, he's had forty minutes. I hope he doesn't interrupt again.—

" 'Then, there might be in that window that Mr. Pierson objects to, a little pair of cowboy boots, and when he turns his face away he looks back over his shoulder again and wonders. The world passes him by. He's just an orphan. He will wonder why he can't have things like kids that have a daddy.

" 'By Mr. Seay: Thank you sir.— And when those two little orphan girls and their mother bow their heads in prayer on the day when the Christian world celebrates the birth of the Christ child, they will not thank God for a bountiful supply of food on the table; they will ask God that they be permitted to live, because the table may be bare.'

"That argument unduly appeals to the sympathetic nature of the average juror and should not be made.

\* \* \* \* \* \*

"We held that it was improper to argue that a corporation could have no sympathy as it stressed things that were not a proper element of damage. Green Construction Co. v. Lampe, 174 Okl. 351, 50 P.2d 286.

"In my opinion this argument was responsible both for the verdict for plaintiff and the amount of the verdict.

"The third reason this case should be reversed is that the size of the verdict shows that it was not rendered by a fair and impartial jury. The jury's verdict was for $79,375. There was no evidence to justify such a verdict. The most the deceased ever made was $3,000 a year. He was a tenant farmer and laborer. There was some evidence that he traded in stock but this was very sketchy. He could not read and write. He was thirty-seven years old and at the peak of his earnings in the type of work he was equipped to do."

We do not think that the majority opinion of the Supreme Court of Oklahoma finally determines the question that the Casualty Company acted in bad faith and neither do we think that the fact that there was a strong dissenting opinion finally determines the question that the Casualty Company acted in good faith.

■ The applicable rule with respect to the duty of an insurer, under the facts and circumstances here presented, was stated by this court in St. Paul-Mercury Indemnity Co. v. Martin, 10 Cir., 190 F.2d 455, 457, as follows:

"As the primary insurer, St. Paul was required under its relationship to its insured and the excess insurer, to exercise good faith in determining whether an offer of compromise of settlement should be accepted or rejected. It owed them the duty to exercise an honest discretion at the risk of liability beyond its policy limits. American Fidelity & Casualty Co. v. All American Bus Lines, Inc., 10 Cir., 190 F.2d 234; Boling v. New Amsterdam Casualty Co., 173 Okl. 160, 46 P.2d 916; National Mutual Casualty Co. v. Britt, 203 Okl. 175, 200 P.2d 407, [218 P.2d

1039]; American Fidelity & Casualty Co. v. All American Bus Lines, Inc., 10 Cir., 179 F.2d 7; American Fidelity & Casualty Co. v. G. A. Nichols Co., 10 Cir., 173 F.2d 830. But, it is not required to prophesy or foretell the results of litigation at its peril. If it acts in good faith and without negligence in refusing the proffered settlement, it has fulfilled its duty to its insured, and those in privity with it. American Casualty Co. of Reading, Pa. v. Howard, 4 Cir., 187 F.2d 322."

Of course, where the judgment is greater than the maximum liability under the policy, the duty of the insurer, who had charge of the action against the insured, to exercise an honest judgment is undoubtedly greater, but that does not mean that the insurer cannot take an appeal where that is the situation, so long as it acts in good faith and without negligence in refusing a proffered settlement.

In National Mutual Casualty Co. v. Britt, Okl., 200 P.2d 407, at page 412, the court said:

"We do not go so far as to say that in every instance where there exists a possibility of a verdict against the insured and the nature of the injuries are such that in the event of such verdict in all probability it will exceed the policy limits, a refusal by the insurer of an offer of settlement within the policy limits constitutes bad faith. But under such circumstances a decision to contest the claim should be subjected to close scrutiny for if based on a mere chance that the claim might be defeated and not on a bona fide belief that the action will be defeated a refusal of such an offer of settlement would not be good faith."

■■ We are of the opinion that under the facts and circumstances presented in the instant case, the minds of reasonable men might differ as to whether the Casualty Company acted in good faith. We do not intend to imply that a trier of the facts might not reach the conclusion that the Casualty Company did act in good faith, but we think there was an issue of fact which should have been submitted, either to the court or to a jury, and that that issue should not have been disposed of on summary judgment.

Reversed and remanded for further proceedings in accordance with this opinion.